### HERCULES IRON WORKS v. DODSWORTH et al.

(Circuit Court, S. D. Ohio, W. D. October 2, 1893.)

#### No. 4,481.

**1. Sale—Warranty—Acceptance.**

An ice machine was furnished under a written contract specifying the various parts, and a guaranty to produce 25 tons of ice daily. The buyer operated the same from the 1st of June until September, when he notified the seller that it did not fulfill the contract, and was not accepted, and requested its removal. The seller declined the request, claiming that the machine was a full compliance with the contract, and had been accepted in July. Afterwards the purchaser continued to use the machine through the fall and during the entire ice season of the two following years. *Held*, that this conduct was an acceptance of the machine, and the seller could sue on the contract; the buyer's only remedy being to recoup from the stipulated price—First, any sums required to cure defects in the parts specified in the contract; and, second, the difference in value between a machine of the actual capacity of the one in controversy and a 25-ton machine.

**2. Evidence—Weight and Sufficiency—Expert Testimony.**

The court will not set aside a verdict based upon conflicting evidence of experts as to the capacity of a machine, especially when the evidence of the defeated party's experts was weakened by manifest exaggerations and inconsistencies.

At Law. Action by the Hercules Iron Works against Caleb Dodsworth and others to recover the contract price of an ice machine. There was a verdict for plaintiff, and defendants now move for a new trial. Motion overruled.

R. S. Fulton and Harmon, Colston, Goldsmith & Hoadly, for plaintiff.

Frank O. Suire, Drausin Wulsin, and Wm. Worthington, for defendants.

TAFT, Circuit Judge. A verdict was rendered by a jury duly impaneled in favor of the plaintiff, the Hercules Iron Works, for the purchase price of an ice machine furnished by plaintiff to defendants under a written contract and guaranty, less certain credits which, plaintiff conceded, should be allowed on the claim. The contract described the machine to be furnished by specifications of its various parts, and contained the warranty "that the machine shall be capable of producing 25 tons of good, crystal, merchantable

ice each twenty-four hours of continuous operation, provided it is kept in good order and properly handled, and the temperature of the condensing water is not above 60 degrees Fahrenheit." The answer set up that the machine furnished had not been a compliance with the contract; that the machine furnished was not the article purchased; and that plaintiff had been notified that the machine was not accepted, and must be removed. It appeared beyond controversy that the machine was ready for operation about June 1, 1890; that it was operated during the summer and fall of that year; that the ice made was sold by and for the benefit of the defendants; that in September defendants sent word to plaintiff that the machine furnished did not fulfill the contract in any respect, and was not accepted, and requested its removal; that plaintiff declined to remove the same, claiming that there had been a full compliance with the contract on its part, and that the machine had been accepted by defendants in the July previous; that, after this correspondence, defendants continued to make ice with the machine during the remainder of September and October, 1890, and during the entire ice seasons of 1891 and 1892, and to sell the ice thus made for their own benefit. It was contended on the part of defendants that, if the machine failed in any material respect to fulfill the description of it in the contract, then this action, which was on the contract, must be defeated. In view of the evidence, the court declined to submit this issue to the jury. It appeared that the machine, described by parts in the contract, had been supplied in substantial compliance with the contract. Some of these parts were claimed to be defective, but none of the defects, if they existed, were of a character which could not be remedied by repairs at a cost very small in comparison with the cost of the machine.

It also was strongly contended that the machine would not make 25 tons of ice a day, and that failure in this was a failure in identity of the article furnished with that agreed to be furnished, so that recovery could only be had on a quantum valebat after defendants had declined to accept the machine under the contract, even if they subsequently kept and used the machine as their own. The court refused to take this view of the case, but charged the jury that the course of the defendants was an acceptance of the machine under the contract, which made the defendants liable for the contract price, but that they might recoup from that price damages of two kinds: First, the equivalent of the sum required to cure defects in the machine, as described by parts in the contract; and, second, the differences between the value of the machine producing the amount of ice per day it could produce and its value if it had been a 25-ton machine. It will not be necessary to review the correctness of this view of the law, for it was fully argued at the trial, and the conclusion reached only after full consideration. Counsel for defendants suggest that they were misled by some observations of the court early in the trial as to the rule of law on the general subject into thinking that the court

would submit to the jury the issue as to the identity of the machine
furnished with that described in the contract, and that, relying
on the merits of this issue, they did not adduce evidence of the
difference in value between the machine furnished and that con-
tracted to be furnished. The remarks referred to, in my opinion,
cannot be reasonably construed to indicate any such intention on
the part of the court. The issues to be submitted could only be
determined after the evidence had all been put in. The admitted
facts at the close of the evidence showed that the defendants had
actually accepted and used the ice machine which the plaintiff
had furnished in attempted compliance with the contract. The
machine furnished corresponded substantially in respect to size,
form, measurements, material, and otherwise with that described
in the contract. It would have been entirely proper for defend-
ants to have introduced evidence of the value of the machine
furnished, and of that to be furnished, whatever their contention
as to a complete defense to the contract. They could not foresee
with certainty what view the jury might take of the issue upon
which their main contention was rested, even if the court had sub-
mitted it to the jury. If they were content to risk the decision
of the jury on this issue, they risked also the action of the court
in respect to the sufficiency of the evidence to raise the issue.

The main argument in support of the motion for a new trial is
based on the claim that the verdict is against the weight of the
evidence. The verdict was for the full amount claimed. The jury
could not have returned the verdict without finding that the ice
machine furnished would make 25 tons of ice in a day, in con-
tinuous operation, when properly handled. This finding, counsel
for defendants claim, is so clearly against the weight of the evidence
as to require the court to set it aside. The machine in question
was a "compression" machine; that is, the ammonia gas was re-
duced to a liquid by pressure effected in a "compressor," and the
cold was produced in this process of reduction. The liquid am-
monia was forced through coils of one-inch iron pipe, placed in
rows in a large tank of brine, and reduced the brine to a tempera-
ture varying from 10° to 17° Fahrenheit. In the tank of brine,
or freezing tank, and between the coils of pipe, (which were 23 in
number, 6 pipes high, and ran the width of the tank, 41½ feet,) were
440 galvanized iron cans, 11 inches wide, 22 inches long, and 36
inches deep, in which was placed the water to be made into ice.
The heat of the water was extracted by the low temperature of
the brine, and after a certain number of hours the water was
frozen into a solid and clear cake, weighing on the average 250
pounds. It is said by counsel for defendants to be established by
the great weight of the evidence that the amount of pipe pro-
vided in the contract, and furnished under it, was not enough to
make 25 tons of ice a day. The only evidence to support this
contention is that of one Rinman, the superintendent of the Bly-
myer Ice Machine Company, which makes a machine operating on
a different principle from that of the plaintiff. Instead of re-

ducing the ammonia gas to a liquid by pressure, this change is brought about by absorption, and water is an agent in the process. The witness had had some little experience 10 or 12 years ago with compression machines. He said that, to produce a ton of ice a day, from 315 to 330 lineal feet of 1-inch iron pipes were required for circulating the ammonia through the brine. This would require from 7,875 to 8,250 feet of pipe. In the machine furnished there were but 5,727 feet of pipe in the freezing tank. If Rinman's statement be true, then the machine as furnished could not furnish more that 5727-7875 of 25 tons a day; that is, not more than 18.18 tons. As the capacity of the machine by actual use by defendants, at various times, for several days of continuous operation, averaged 22 tons a day, the evidence of Rinman is shown to be unreliable to the extent of at least 3 tons a day. Counsel for defendants, when this was pointed out by opposing counsel, frankly admitted that Rinman had put his requirement of pipes too high. If he has made an error at all in the matter, it is difficult to see how his statement can be qualified or reconciled with facts, and then have any weight to overcome the evidence of the experts engaged in making plaintiff's machine, who say that the amount of pipe furnished was ample for the production of 25 tons. At least, it is obvious that, upon this part of defendants' contention, the answer of the jury against defendants is sufficient.

But it is said that the number of cans, and therefore the size of the freezing tank, was not sufficient to produce 25 tons of ice in 24 hours. The argument is this: It is said to be established by Rinman and Zoast, and also by McDonald, that it takes 60 hours to freeze a can of water 11x22x36 into a solid cake of ice. Now, to make 25 tons of ice a day, the machine would have to freeze solid 200 cans of 250 pounds each, or $8\frac{1}{3}$ cans an hour. To pull $8\frac{1}{3}$ cans an hour when it requires 60 hours to freeze a can, there would have to be $8\frac{1}{3}$x60 or 500 cans in the different stages of freezing, instead of the 440 cans actually supplied. The capacity of a freezing tank of 440 cans of a size 11x22x36, on this theory, would be $\frac{440}{60}=7\frac{1}{3}$ cans an hour, or 24x$7\frac{1}{3}$=176 cans of 250 pounds each,—that is 44,000 pounds, or 22 tons. This is a mathematical demonstration that the machine was not up to the guaranty if the premise of the argument is established that it takes 60 hours to freeze a can of water 11x22x36 inches in dimension. This is shown, it is said, by Rinman, Zoast, and McDonald. Rinman says that, to freeze such a can of water with brine at more than $12\frac{1}{2}°$ Fahrenheit, he would require at least 68 hours. The temperature of the brine in this machine was generally more than $12\frac{1}{2}°$, and was intended to be. Rinman says that, at less than $12\frac{1}{2}°$ brine temperature, he would require 63 hours. Zoast says that at the Cincinnati Cold Storage Company, when he operated as engineer a compression ice machine, known as the "Arctic," it took 60 hours to freeze cans of ice containing 300 pounds of water, and of dimensions $10\frac{1}{2}$x22x38, with a brine temperature of from 16° to 18°. McDonald

did not say that it would require 60 hours to freeze a can of water in plaintiff's machine. What he said was that in beginning the operation of the machine with the water, brine and ammonia, all in the normal state, it would take from 60 to 75 hours to freeze a can solid. With reference to the time required for freezing cans in continuous operation with other cans partly frozen and brine temperature 17° or lower, he said that the different system or machines varied from 48 to 60 hours in their freezing period. The necessary effect of McDonald's evidence, and that of Knox, another expert of plaintiff, was that 52 or 53 hours was enough to freeze a can solid in plaintiff's machine. Now, it is said that the time of freezing with the brine at a constant temperature must be the same in every machine, because the difference in the machines is only in the method of reducing the temperature of the brine, and cannot be in the action of the brine thus reduced in temperature upon the water; for that process is wholly natural, and can only vary with the size and shape of the can and the temperature of the brine. Concede that this is true; I do not think that the weight of evidence is clearly in favor of 60 hours as a freezing period. Rinman's evidence upon this point is weakened exactly as it was upon the question of the necessary amount of pipe. It is conceded that plaintiff's machine could make 22 tons a day with 440 cans, at a brine temperature of more than $12\frac{1}{2}$°. Rinman's 68 hours' freezing period, for 22 tons' daily production, would require 499 cans of the size used by plaintiff, and, even if his figures are put at 63 hours for the freezing period, the machine should have 462 cans to produce 22 tons of ice. Rinman is clearly wrong in stating that it would take 68 hours to freeze plaintiff's cans. Why should his estimate be reduced to 60 when he did not do it himself?

Then take Zoast's figures. He differs widely from Rinman. His temperature he puts at from 16° to 18°. His size of can contains 300 pounds of water; i. e. one-sixth larger than plaintiff's can. Confessedly, the size of the can, if thicker or broader, materially affects the freezing period. The dimensions of his can as he gave them were $10\frac{1}{2}$x22x38. If the water in them weighed 300 pounds, he has made an error in his size dimensions, because plaintiff's cans are 11x22x36, and the water they contain weighs 250 pounds. If the thickness dimension of the Arctic were 13 inches, instead of 11, the difference in weight would be about 50 pounds, and the reason for a longer freezing period than in plaintiff's machine might be explained. However this may be, Zoast has made an error somewhere. He differs radically from Rinman in his freezing period. Such evidence does not so clearly establish a necessary freezing period longer than 52 or 53 hours as to require the court to say that the jury, in disregarding it, and in crediting the witnesses for plaintiff, violated its duty.

Finally, there was a test made by plaintiff's engineer, Knox. It is said that neither in this test nor in the subsequent operation of the machine was it able to produce 25 tons of ice a day in contin-

uous operation. It appears that Knox ran the machine for a period of 59 hours upon the 21st, 22d, and 23d of July, 1890, and produced 25 tons for one 24 hours, and 28 tons for the second 24. But it is said that this was not a proper proof of the capacity of the machine in continuous operation, because for 12 hours before beginning it he allowed the freezing tank to continue at a temperature of from 16° to 10°, and during that time drew no cans of ice at all, and also because, when he finished his test, the temperature of the brine had risen from 10°, at the beginning, to 17°, indicating that a continuance of the operation would have increased the temperature of the brine beyond 17°, and prevented the constant production of ice. Both criticisms are just, but, as opposed to them, it may be properly urged that the required capacity was exceeded. The further operation of the machine by defendants' men developed at times a capacity of 23½ tons, and on one occasion of more than 25 tons. Sometimes the daily yield is explained by a storing of low temperature through a failure to draw cans the day before, and in other instances it is not.

Plaintiff contended that the failure to constantly produce 25 tons a day was due to careless and improper handling of the machine, to imperfect insulation of the freezing tank, and to bad oil used in lubricating the joints, etc. It was claimed on plaintiff's behalf that the insulation had been rendered imperfect by a failure of defendants to construct a foundation in accordance with the plans and specifications furnished by plaintiff under the contract, and evidence was adduced tending to show this. It was claimed that defendants did not buy the oil which plaintiff's engineers directed them to use. Whether these causes existed, and whether they fully accounted for the failure of the machine to do its guarantied work, were questions for the jury to decide. Many circumstances tended to show to the jury that much of the trouble in the construction and operation of the machine was due to the interference of Caleb Dodsworth, the managing defendant, in the operation of the machine, and his stubborn views of how the machine should be constructed, operated, based on little, if any, experience in making ice. Counsel for plaintiff dwelt upon this in addressing the jury, and complaint is made that this misled the jury. I think that this was a legitimate argument, founded on a great deal of the evidence, and that it is probably the best explanation of the failure of the machine to do the work promised. Not only do I not think that the verdict is against the weight of the evidence, but I am not prepared to say that I would not have reached the same conclusion as the jury.

The motion is overruled, and judgment may be entered on the verdict.